[Civ. No. 12360. Fourth Dist., Div. Two. May 14, 1974.]

EVELYN EVANS, Plaintiff and Appellant, v.
RICHARD D. OHANESIAN, Defendant and Respondent.

122

**COUNSEL**

Albert E. Nasser for Plaintiff and Appellant.

Ruston & Nance and Patrick A. McCormick, Jr., for Defendant and Respondent.

## OPINION

**KERRIGAN, J.**—This is a malpractice action by a Garden Grove patient against a Garden Grove dentist. During the course of a jury trial, the patient's attorney called two Beverly Hills dentists: one a specialist; the other a general practitioner. The trial court ruled that neither was competent to express an opinion on the ultimate issue as to whether the defendant was negligent in the treatment he rendered the plaintiff. The court evidently based its ruling on the premise that the specialist would hold the defendant to a higher standard of care than required of a general practitioner and that the Beverly Hills practitioner was not familiar with the standard of care expected of an Orange County practitioner. Thereafter, the trial court granted defendant's motion for a nonsuit, entered a judgment of nonsuit and denied a motion for a new trial.

Plaintiff maintains the trial court abused its discretion in ruling that the two Beverly Hills dentists were not competent to testify. We agree. In addition, we conclude that there was sufficient evidence to permit the matter to go to the jury.

On May 9, 1969, plaintiff visited the defendant's office for the purpose of having her upper partial plate repaired. The partial consisted of one tooth. The plate had a crack in it and the tooth had broken off. Defendant took an X-ray and suggested that a permanent bridge be inserted to replace the removable partial plate. Plaintiff agreed. On May 13, defendant reinserted the repaired partial plate into plaintiff's mouth and again took X-rays. On May 28, defendant gave plaintiff a zylocaine injection and then cut down the two front teeth to the right and left of the missing tooth (known as the right lateral and left central upper). He covered both shaved teeth with a temporary jacket and reinserted plaintiff's repaired denture. After the temporary jackets had been placed upon the ground teeth and after plaintiff's partial had been inserted to fill the gap of the missing tooth, plaintiff experienced some pain. The two shaved teeth hurt and her gums were swollen. The following day, she returned to defendant's office. She told him of her complaints and he did some grinding. Defendant assured plaintiff the pain was caused by the temporary teeth and her complaints would be alleviated when she received her permanent bridge.

On June 25, the permanent bridge was cemented in place. That night the intensity of pain increased.

On June 27, plaintiff returned to defendant's office and complained that the teeth on the bridge were too long and that she was experiencing pain.

Defendant trimmed down plaintiff's incisor ledge and checked her centric bite.

When the pain persisted, plaintiff went to see another dentist, Dr. Berman. Dr. Berman examined plaintiff and observed that the bridge was in "traumatic occlusion," i.e., that the bridge hit her lower teeth before her natural uppers hit her natural lowers. Dr. Berman advised her to return to defendant for treatment. She did and defendant adjusted the bridge. In fact, when plaintiff continued to complain of pain, defendant saw her at least seven times during July. On some of these visits, adjustments were made. On August 8, plaintiff complained of a "lump" which had appeared on the top of the far left tooth of her bridge. Defendant took X-rays to locate an abscess but testified he found no definite indication of an abscess. However, in late August, defendant observed the fistula and concluded that plaintiff's central (left) tooth was abscessed. Defendant again undertook a grinding procedure on the incisor ledge to shorten the teeth so she would not "grind" them. Defendant continued to see plaintiff during the months of August-November. Finally, in December defendant advised plaintiff that root canal therapy was necessary. However, plaintiff was unable to get an immediate appointment for defendant to do the work.

Plaintiff returned to Dr. Berman. In January 1970, he took X-rays and noted abscesses on both of the ground teeth. He referred plaintiff to a root canal therapy specialist and from January to December 1970, she was treated intermittently by Dr. Berman and Dr. Buell. Dr. Buell did the root canal therapy and his bill was $160. Dr. Berman installed a new bridge at a cost of $466. Defendant's bill was $342.

During the trial, Dr. Berman testified to the following effect: traumatic occlusion is one of the major causes of abscess; root canal treatment is an urgent procedure since the untreated abscess destroys the adjoining bone as it gets larger; when he examined the plaintiff on July 3, 1969, he observed no abscess and no inflammation of the gum; however, he did diagnose an abscess on January 19, 1970.

Dr. Max Shapiro, a Beverly Hills periodontist who treats diseases of the teeth and supporting structures of the teeth, testified as follows: Over the years he has treated several thousand dental patients requiring bridge work, tooth preparation for bridges and related problems of abscesses and root damage; he has also supervised general practitioners in the Los Angeles-Long Beach area who prepare teeth for permanent bridges and install bridges; he has taught on the subject of tooth preparation; he has practiced general dentistry and periodontology in Los Angeles and Beverly Hills; he has given lectures throughout the state for 20 years on the subject

of tooth preparation; the Orange County Dental Society is one of the organizations before whom he has lectured; he examined plaintiff on March 18 and May 10, 1972; he obtained her dental history and reviewed her dental records; her complaints of sensitivity when eating or drinking anything hot or cold commencing on May 28, 1969, when defendant first cut into her teeth with a dental drill to prepare them for the permanent bridge indicated damage to the nerve or pulp of the tooth; her complaints of July 3, 1969, diagnosed by Dr. Berman as "traumatic occlusion" indicated irreversible damage to some of the tissues around the tooth instead of the pulp tissue inside of the tooth; the appearance of the fistula in August 1969 was a logical but not inevitable symptom since pulp death can occur with or without the fistula; as the pulp inside the tooth chamber dies, bacteria invade the area and the resulting toxins destroy the bone; the toxins may drain internally or break out through the gum surface (as a fistula); he diagnosed plaintiff's dental problems as pulpitis of both teeth (the upper left central incisor and the upper right lateral incisor) progressing to necrosis or death of the pulp within three or four weeks following placement of the bridge; his X-rays taken in May 1972 showed bone loss of both teeth and the bone loss is progressing; the prognosis for both teeth is poor and would require extensive and costly treatment; in his opinion, defendant's treatment caused plaintiff's pulpitis and the injury occurred at the time of the preparation of the teeth for insertion of the bridge.

However, the trial court would not permit Dr. Shapiro to express an opinion on the standard of practice of a general practitioner in Orange County and would not allow him to express an opinion as to whether defendant breached that standard. The trial court commented, outside the presence of the jury, that Dr. Shapiro's standard of practice as a specialist was higher than the standard of practice of general practitioners in Orange County and that it would be unfair to hold the defendant to a higher standard of practice than that possessed generally by other dentists in Orange County.

Following the trial court's ruling that Dr. Shapiro could not express an opinion on the subject of defendant's negligence, defendant made a motion for nonsuit. The motion was granted. However, plaintiff was permitted to reopen for the purpose of producing a general practitioner— as distinguished from a specialist.

Plaintiff's counsel then called Dr. Hockenberg, a Beverly Hills general practitioner. On *voir dire,* he testified that the standards of skill in Beverly Hills and in Orange County were approximately the same but he felt that

the "level of general practitioners" in Beverly Hills "is quite a bit higher, more demanding" and that he was "not too familiar with Orange County" as regards a comparison of the standards of care in Orange County to that of Beverly Hills. The court ruled that Dr. Hockenberg was not personally familiar with Orange County standards and therefore could not testify as to the standards of general practitioners in Orange County.

In desperation, plaintiff subpoenaed an Orange County dentist, Dr. Nall, a Santa Ana general practitioner. In response to some hypothetical questions, he testified as follows: Failure to refer a patient suffering from an abscessed tooth to a root canal specialist for root canal therapy is a failure of due care; if a patient has a fistula and there is continued pain and the treating dentist cannot find the cause, good practice requires referral to a specialist to see if he can determine the cause; if he had observed a fistula in August 1969, he would have referred plaintiff to a root canal specialist; however, it was possible that plaintiff's teeth were abscessed before the defendant worked on them; as to plaintiff's complaints of pain in her upper anterior teeth in the period August 1969-November 1969, the pain probably came from the abscess or fistula; however, the pain could have been caused by "another tooth," two of plaintiff's teeth were abscessed and either could have caused the pain, however, he could not say with any degree of certainty which tooth caused the pain; if a fistula is open and draining there is no pain; if the fistula is closed there would be pain; however, a dentist cannot tell if the abscessed tooth without a fistula is causing pain; the only definite cause of pain is a closed fistula.

At the conclusion of Dr. Nall's testimony, defendant again moved for a nonsuit upon the ground the plaintiff had failed to prove defendant's negligence was the proximate cause of any damage, because Dr. Nall could not pinpoint the pain in the upper anterior region of her mouth to the precise tooth or teeth causing the pain. The nonsuit was granted.

■ Turning to the propriety of the trial court's rulings, it is axiomatic that the qualification of an expert is ordinarily a matter addressed to the sound discretion of the trial court, and its ruling will not be disturbed on appeal unless a clear abuse of discretion is shown. (*Miller* v. *Los Angeles County Flood Control Dist.,* 8 Cal.3d 689, 701 [106 Cal.Rptr. 1, 505 P.2d 193]; *Kopfinger* v. *Grand Central Pub. Market,* 60 Cal.2d 852, 860 [37 Cal.Rptr. 65, 389 P.2d 529]; *Cline* v. *Lund,* 31 Cal.App.3d 755, 766 [107 Cal.Rptr. 629].) The determinative test as to whether the trial court properly exercised its discretion is whether the witness has disclosed sufficient knowledge of the subject to go to the jury. (*Seneris* v. *Haas,* 45 Cal.2d 811, 833 [291 P.2d 915, 53 A.L.R.2d 124].)

██ To qualify a witness as a medical expert, it must be shown that the witness (1) has the required professional knowledge, learning and skill of the subject under inquiry sufficient to qualify him to speak with authority on the subject; and (2) is familiar with the standard required of a physician under similar circumstances; where a witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury, the question of the degree of his knowledge goes more to the weight of the evidence than to its admissibility. (*Seneris* v. *Haas, supra,* 45 Cal.2d 811, 833.)

In *Sinz* v. *Owens,* 33 Cal.2d 749 [205 P.2d 3, 8 A.L.R.2d 757], the plaintiff sustained a double comminuted fracture of the tibia and fibula of his left leg as a result of a traffic accident and was treated by a Lodi physician; the defendant-doctor took X-rays; the first X-ray showed good bone alignment so defendant applied a plaster cast; subsequent X-rays revealed an increasing angulation of bone in the upper and lower fractures; plaintiff called a Stockton physician (Stockton and Lodi are adjoining communities) for the purpose of establishing the standard of practice in California regarding the use of skeletal traction on a double comminuted fracture; the defense contended the Stockton doctor was not qualified to testify as to the standard of medical practice in Lodi; the reviewing court found that the expert should not have been prohibited from testifying solely upon the basis of the geographical location of the witness' practice and held that the expert witness may not be arbitrarily excluded from testifying on geographical grounds; the court held that the criteria for determining expertise are as follows: (1) occupational experience, the kind which is obtained casually and incidentally, yet steadily and adequately in the course of some occupation or livelihood; (2) basic education and professional training; and (3) practical knowledge of what is customarily done by physicians under circumstances similar to those which confronted defendant.

Nor is it critical whether a medical expert is a general practitioner or a specialist so long as he exhibits knowledge of the subject. ██ Where a duly licensed and practicing physician has gained knowledge of the standard of care applicable to a specialty in which he is not directly engaged but as to which he has an opinion based on education, experience, observation or association with that specialty, his opinion is competent. (*Cline* v. *Lund, supra,* 31 Cal.App.3d 755, 766.) The reason for not requiring specialization in a certain field is obvious. Physicians are reluctant to testify against each other. (*Huffman* v. *Lindquist,* 37 Cal.2d 465 [234 P.2d 34, 29 A.L.R.2d 485]; *Berkey* v. *Anderson,* 1 Cal.App.3d 790 [82 Cal.Rptr. 67].) Consequently, when an expert can be found, it is immaterial whether he is a general practitioner or a specialist providing

he has knowledge of the standard of care in any given field; otherwise, the plaintiff could never prove a case against a specialist unless he had an expert of the particular specialty, and the plaintiff would never be able to sue a general practitioner unless he had a general practitioner who was willing to testify as an expert. (See *Cline* v. *Lund, supra,* 31 Cal.App.3d 755, 767.)

■ The opinions of both Dr. Shapiro and Dr. Hockenberg should have been admitted in evidence and the trial court grossly abused its discretion by precluding the plaintiff from introducing their opinions on geographical grounds. Similarly, the trial court erred in holding that Dr. Shapiro could not render an opinion because he was a specialist.

■ Finally, the trial court should not have granted a nonsuit on the basis of the evidence already before it. ■ On an appeal from the granting of a motion for nonsuit, the court must view the evidence in the light most favorable to appellant, disregarding all inconsistencies and drawing only those reasonable inferences favorable to him. (*Harte* v. *United Benefit Life Ins. Co.,* 66 Cal.2d 148, 152 [56 Cal.Rptr. 889, 424 P.2d 329]; *Sunset Milling & Grain Co.* v. *Anderson,* 39 Cal.2d 773, 779 [249 P.2d 24].)

■ Plaintiff testified that she had no serious dental problems prior to the May 1969 visit to defendant's office for the repair of her partial plate; that defendant took an X-ray of her upper mouth at the time of her first or second visit; that after defendant undertook treatment, she experienced severe pain and considerable discomfort; that she called the "lump" or fistula to his attention in August 1969; and defendant did not prescribe root canal therapy until December.

Dr. Shapiro testified that an abscess requires immediate treatment inasmuch as bacteria invade the pulp and cause the eventual death of the pulp. Dr. Nall confirmed the necessity for immediate root canal therapy when any symptom of an abscess appears (such as a fistula), and that failure to refer plaintiff to a root canal therapist after discovering the closed fistula would constitute a breach of good practice.

In sum, then, there was testimony before the jury presenting the elements of a prima facie case of actionable negligence. Legal duty to use due care, a breach of that duty, and proximate causation linking the breach with the injury to plaintiff could reasonably be inferred from evidence in the record at the time the nonsuit was granted. (Civ. Code, § 1714; *United States Liab. Ins. Co.* v. *Haidinger-Hayes, Inc.,* 1 Cal.3d 586 [83 Cal.Rptr. 418, 463 P.2d 770]; *Schwartz* v. *Helms Bakery Limited,*

67 Cal.2d 232 [60 Cal.Rptr. 510, 430 P.2d 68]; *Fuller* v. *Standard Stations, Inc.,* 250 Cal.App.2d 687 [58 Cal.Rptr. 792]; *Galanis* v. *Mercury Internat. Ins. Underwriters,* 247 Cal.App.2d 690 [55 Cal.Rptr. 890]; 4 Witkin, Summary of Cal. Law (8th ed. 1974) § 488 at p. 2749.) While there was some question as to whether defendant's alleged maltreatment caused plaintiff's permanent dental problems, this constituted a dispute about a factual matter for the jury's determination. *(United States Liab. Ins. Co.* v. *Haidinger-Hayes, Inc., supra,* 1 Cal.3d 586; *Mosley* v. *Arden Farms Co.,* 26 Cal.2d 213 [157 P.2d 372, 158 A.L.R. 872]; *Fuller* v. *Standard Stations, Inc., supra,* 250 Cal.App.2d 687; *Ishmael* v. *Millington,* 241 Cal.App.2d 520 [50 Cal.Rptr. 592]; Rest.2d Torts, § 434; Prosser, Law of Torts (4th ed. 1971) § 37; 2 Harper & James, The Law of Torts (1956) § 15.1.)

█ The granting of a motion for nonsuit is warranted only when there is no evidence to support a verdict in favor of the plaintiff (Code Civ. Proc., § 581c; *Raber* v. *Tumin,* 36 Cal.2d 654 [226 P.2d 574]; *Doria* v. *International Union,* 196 Cal.App.2d 22 [16 Cal.Rptr. 429]; *Jones* v. *Hotchkiss,* 147 Cal.App.2d 197 [305 P.2d 129].) Since this clearly was not the case in the action at bar, the court erred in granting the nonsuit.

The judgment of nonsuit is reversed.

Gabbert, Acting P. J., and Kaufman, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied July 10, 1974.